IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN GLASS MACHINERY,<br>　　　　Plaintiff, | )<br>)<br>)    C.A. No. 23-275 Erie |
| v. | )<br>) |
| RAY OTT and JOHN PAVALONIS<br>d/b/a ARKAUM INDUSTRIES LLC,<br>　　　　Defendants. | )    District Judge Susan Paradise Baxter<br>)<br>) |

## MEMORANDUM OPINION

**I.    INTRODUCTION**

**A.    Relevant Procedural History**

Plaintiff American Glass Machinery ("AGM") initiated this action by filing a complaint against Defendants Ray Ott ("Ott") and John Pavalonis ("Pavalonis") d/b/a Arkaum Industries LLC ("Arkaum"), pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 et seq. ("DTSA"), and the Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301, et seq. ("Pa.UTSA"). The complaint contains three counts: Count I is a claim of misappropriation of trade secrets under the FTSA; Count II is a claim of misappropriation of trade secrets under the Pa.UTSA; and Count III is a claim of inevitable disclosure of confidential information and trade secrets against Defendant Pavalonis only. As relief for its claims, Plaintiff seeks injunctive relief and monetary damages.

On June 11, 2024, Defendant Pavalonis filed a *pro se* "Motion to Be Removed from the Case" [ECF No. 24], which the Court liberally construes as a motion to dismiss under Rule 12(b)(6). Pavalonis contends that his role in the alleged misappropriation was minimal and insufficient to support the claims against him. Defendant Ott filed his own motion to dismiss

1

under 12(b)(6) on July 22, 2024, arguing that Plaintiff's complaint is barred by the three-year statute of limitations. [ECF No. 30]. Both motions been fully briefed by the parties. This matter is now ripe for consideration.

### B.  Relevant Factual History

As pleaded, the factual timeline of events underlying this action have been presented separately for each Defendant. For clarity and organizational efficiency—given the importance of the sequence of events—this Court recapitulates the factual background in a linear manner.

AGM manufactures, sells, and services new and reconditioned glass processing equipment. Its core business involves the proprietary design, production, and maintenance of open- and closed-top flat glass washers. (ECF No. 1 at ¶¶ 10–11). In May 2019, Defendant Ott's son, Riley Ott ('Riley'), began working for AGM. His primary role was converting hand-drawn assembly diagrams into computer-aided design ("CAD") files, which constituted AGM's proprietary information. Riley was aware of their confidential nature. (*Id.* at ¶¶ 22, 24).

In mid-June 2019, AGM assigned Riley to digitize its original hand-drawn assembly drawings for an 84-inch vertical flat glass washer into CAD files. (*Id.* at ¶ 31). He was also responsible for drafting an operations manual for the washer, which incorporated AGM's proprietary wiring diagrams and other confidential technical specifications. Through these tasks, Riley gained access to AGM's trade secrets—including machine drawings, electrical schematics, and parts lists—all clearly marked as confidential. (*Id.* at ¶¶ 31–32). Riley stored the CAD files on both his personal laptop and AGM's email system. (*Id.* at ¶ 35). He further assisted AGM's shop foreman, Defendant Pavalonis, in assembling the physical washer using the digitized plans he had created. (*Id.*).

2

In May 2020, Riley recommended that AGM hire his associate, Jarrett Mosco ("Mosco"). AGM's CEO, Vincent Sadlek ('Sadlek'), accepted this recommendation and brought Mosco on board. (*Id.* at ¶ 29). Mosco's primary responsibility was assisting Riley with preparing CAD drawings. (*Id.*). Two months later, in July 2020, Defendant Ott assumed the position of "Manager of Marketing and Product Development" for Automated Glass Washing Machines at Arkaum, a subsequently established business. (*Id.* at ¶ 44).[1]

On August 6, 2020, Mosco improperly emailed proprietary Tesla-related drawings to his personal email. (*Id.* at ¶ 40). Two days later, on August 8, 2020, Riley similarly transmitted confidential AGM CAD files to his personal email. (*Id.* at ¶ 36).

On August 11, 2020, Pennsylvania issued a Certificate of Organization for Arkaum, listing Defendant Ott's residential address as its principal place of business. (*Id.* at ¶ 41). According to the pleadings, Arkaum was formed to manufacture and sell glass panel washers identical to AGM's proprietary design. (ECF No. 37 at p. 8). The company's initial members were Riley and Mosco. (ECF No. 1 at ¶ 42).

On August 16, 2020, a meeting occurred involving Riley, Mosco, Pavalonis, and Ott, during which they detailed plans to develop Arkaum while working for AGM, without signaling their intentions to AGM. Subsequently, on August 28, 2020, Riley and Mosco voluntary resigned from AGM. (ECF No. 1 at ¶ 48).

On September 9, 2020, the IRS issued Arkaum an Employer Identification Number (EIN 85-2928556). (*Id.* at ¶ 43). That same day, Riley notified Sadlek that neither he nor Mosco wished to remain employed by AGM. (*Id.* at ¶ 48). While Riley promised to return AGM's physical property, he asserted that he and Mosco retained ownership of certain original

---

[1] Arkaum was ultimately incorporated on August 11, 2020.

3

intellectual property. (*Id.*). It is believed that shortly after September 9, 2020, Riley prepared a memorandum outlining his power to "halt [Sadlek]'s business" and distributed it to, at least, Mosco and Ott. (ECF No. 1-2 at p. 26).[2]

On September 18, 2020, AGM terminated Pavalonis after learning he was performing identical work for Arkaum. (*Id.* at ¶ 69). Three days later, on September 21, Sadlek demanded in writing that Riley and Mosco (1) return all AGM equipment and proprietary materials, and (2) cease using such information for personal or third-party gain. (*Id.* at ¶ 49). AGM subsequently discovered that Riley and Mosco had emailed proprietary files to themselves on August 6 and August 8, 2020, respectively. (*Id.* at ¶ 50). It was also "after September 21, 2020" that Sadlek uncovered meeting minutes reflecting the August 16, 2020 meeting among Riley, Ott, Pavalonis, and Mosco. (*Id.* at ¶ 77).

## II. DISCUSSION

### A. Defendant Pavalonis

Pavalonis argues, in essence, that he is being brought into this matter for passively attending a meeting. Specifically, he contends that he only ever attended one meeting, was never hired or paid by Arkaum, and that the single meeting he attended spelled both the inception and dissolution of Arkaum. Plaintiff contends that Pavalonis is liable under both the DTSA and PUTSA. (ECF No. 28 at p. 14).

To prevail on a claim for misappropriation of trade secrets under both the DTSA and the PUTSA at the motion to dismiss stage, a plaintiff must plausibly plead "(1) the existence of a trade secret, (2) that the trade secret was protectible, and (3) that it was misappropriated by the

---

[2] It appears that Riley and Mosco submitted their voluntary resignations on August 28, 2020 but continued to work for AGM thereafter. A "two-week notice" period would explain why Riley and Mosco continued to work with AGM until approximately September 9, 2020. It is unclear whether this is definitively the case based on the pleadings.

4

defendant." *Elmagin Cap., LLC v. Chen*, 2024 WL 2845535, at *2 (3d Cir. Mar. 21, 2024); *See also*, *Paragon Eng'g Servs., Inc. v. Providence Eng'g Corp.*, 2024 WL 5046719, at *7 (M.D. Pa. Dec. 9, 2024) (claims under the DTSA and the PUTSA require the same elements).

### 1.    Existence and Protectability of a Trade Secret

To plead the existence of a trade secret in a misappropriation claim brought under the either the DTSA or PUTSA, a Plaintiff must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such. *See,* 18 U.S.C. §§ 1836(b), 1839(3). A trade secret is, by definition, "information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018). Courts have analyzed whether information is a trade secret by evaluating the following six factors: (1) existence of knowledge of the information outside of the business, (2) extent of knowledge of the information within the business, (3) measures taken to protect the alleged secret, (4) the information's value, (5) the amount of resources used in creating the information, and (6) the difficulty of legitimately acquiring or duplicating the information. *Garcia v. Vertical Screen, Inc.*, 2020 WL 2615624, at *4 (E.D. Pa. May 20, 2020) (citing *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)). This Court will address each factor in turn, noting that some overlap exists in evaluating each factor.

First, the proprietary information at issue—including electrical wiring diagrams, machine drawing and schematics, original and CAD drawings, machine assembly drawings, operating manuals, and customer lists—was maintained by AGM in password-protected systems and

5

disclosed only to employees on a "need to know" basis. (ECF No 1. at ¶ 18). Furthermore, AGM engaged third parties using non-disclosure agreements ("NDA") to protect its information, and no facts or pleadings indicate that this information was ever made public or known outside AGM's operations. (*See, Id.* at ¶ 19),

Second and third, AGM took active steps to protect its proprietary information, including storing it in secure, password-protected systems and restricting access to a "need to know" basis. (*Id.*). Additionally, AGM employed the use of NDAs, lock and key protection, and provided notice to its employees with access to trade secret information by clearly marking information and property as "confidential." (*See, e.g., Id.* at ¶ 38). These measures demonstrate affirmative efforts to maintain secrecy beyond mere routine business practices, and demonstrate that the information was likely unavailable outside of the business.

Fourth and fifth, the facts establish that AGM's proprietary information provided a competitive advantage, as evidenced by the alleged harm suffered when former employees used the data in attempts to undercut AGM's pricing and or sell the same product in a niche market. (*Id.* at ¶¶ 15, 82). Additionally, because AGM invested decades and significant resources into developing its proprietary information, it is foreseeable that the information developed by AGM, which cost substantial investment, may be costly and difficult to duplicate. (*Id.* at ¶ 13).

Sixth, the information was not readily obtainable by competitors through public channels or independent research. Duplicating AGM's processes would require reverse-engineering or improper access, given the security measures in place. AGM has alleged that, to facilitate the trade misappropriation, not only did Arkaum attempt to hire Pavalonis and eventually planned to hire Sadlek to create AGM's own proprietary products, it also alleges that Ott—without

6

authorization—entered into AGM's premises for the purpose of inspecting an unfinished washer presumably to learn details of its functionality. (*Id*. at ¶¶ 27, 59, 74).

Accordingly, each factor weighs in favor of trade secret protection. AGM's information was closely held, actively protected, economically valuable, costly to develop, difficult to duplicate, and disclosed solely under confidentiality agreement or "need to know" basis. No facts suggest the information was public or unprotected. Accordingly, the proprietary information qualifies as trade secrets that were protectible at this stage.

### 2.    Occurrence of Misappropriation

Misappropriation encompasses "disclosure or use of a trade secret" without consent, including "relying on the trade secret to assist or accelerate research or development[.]" 18 U.S.C. § 1839(5)(B); 12 Pa. C.S. § 5302; *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 909 (3d Cir. 2021). In other words, to successfully bring a claim for trade secret misappropriation the plaintiff must establish the disclosure of that secret in a confidential relationship. *See, Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 565 n.2 (3d Cir. 2003). Assuming the veracity of AGM's well-pleaded factual allegations, and construing all reasonable inferences that may be drawn from them in favor of AGM, misappropriation has been adequately pled at this stage for purposes of evaluating Pavalonis' 12(b)(6) motion.

Here, the Plaintiff alleges that members of Arkaum conspired with Pavalonis to use stolen trade secrets - specifically, AGM's proprietary drawings for a vertical flat glass - to unfairly compete against AGM in the glass washing machine market. (ECF No. 1 at ¶ 82). Plaintiff further claims that Pavalonis participated in a confidential meeting on August 16, 2020, with Riley, Ott, and Mosco, where they discussed strategies for Arkaum, as a startup, to compete with AGM in manufacturing and selling such machines. (*Id*. at ¶ 81).

While these allegations lack precise detail about Pavalonis' specific role in the alleged scheme, or what the extent of his disclosure and communication might have been, they are sufficient at the pleading stage to support a facially plausible claim that Pavalonis communicated trade secrets, either as a conspirator or through discussion, in furtherance of Arkaum's development. Furthermore, it has also been plausibly alleged that by communicating the trade secrets, which were confidential in nature and only provided to Pavalonis because of his employment with AGM, Pavalonis also disclosed those trade secrets in violation of the confidential relationship manifest between him and AGM. Thus, Defendant Pavalonis's motion will be denied and the claims against him will be allowed to proceed beyond the pleading stage.

### B. Defendant Ott

#### 1. Statute of Limitations – Standard of Review

A district court may dismiss a complaint on a Rule 12(b)(6) motion based on the time bar of the statute of limitations only if it can determine (before the factual record is fully developed) when the claim accrued and whether any tolling periods apply. *See*, *Oshiver v. Leven, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1381 n. 1 (3d Cir.1994) ("While the language of Fed.R.Civ.P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a 12(b)(6) motion, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.")

A plaintiff must bring a claim under either the DTSA or the PUTSA no later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. *See*, 18 U.S.C. § 1836; 12 Pa. C.S. § 5307. Both the DTSA and PUTSA explicitly incorporate the discovery rule. *Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 734 (3d Cir. 2019) ("The

PUTSA explicitly incorporates the discovery rule"); *Nasdaq Inc. v. Miami Int'l Holdings, Inc.*, 2023 WL 4740753, at *8 (D.N.J. July 25, 2023) ("the DTSA…explicitly incorporates [the] discovery rule"). Thus, until such time as Plaintiff discovered, or reasonably should have discovered, the cause of action, the running of the statute is tolled. *See, Beauty Time, Inc. v. VU Skin Sys., Inc.,* 118 F.3d 140, 144 (3d Cir. 1997).

### 2.   Statute of Limitations - Analysis

Here, Plaintiff's complaint was filed on September 25, 2023. Thus, in order to comply with the applicable statute of limitations, Plaintiff's actual or constructive discovery of Defendant Ott's alleged misappropriation of trade secrets must have occurred on or after September 25, 2020. In this regard, Plaintiff alleges that Ott engaged in a conspiracy with Riley and Mosco to misappropriate AGM's trade secrets—including proprietary CAD files and technical specifications—for the benefit of Arkaum in the weeks leading up to his August 2020 resignation. (ECF No. 1 at ¶ 47). However, according to the complaint, AGM discovered this scheme "only after September 21, 2020," when it discovered meeting minutes from an August 16, 2020 discussion involving Ott, Riley, Mosco, and Pavalonis, as well as a memorandum on Riley's work computer describing the power to "halt [Sadlek]'s business." (*Id.* at ¶¶ 77, 79; ECF No. 1-2 at p. 26). Thus, the precise date on which Plaintiff knew or should have known of the alleged misappropriation is not clear from the face of the complaint, because the discovery of the relevant meeting minutes and memorandum could have occurred on or after September 25, 2020.[3]

---

[3] Defendant Ott's argument that AGM should have been aware of the alleged misappropriation no later than September 18, 2020, when AGM terminated Pavalonis for working for Arkaum in the same role he held at AGM, is not at all clear from the face of the complaint. Instead, such a conclusion can only be arrived at by extrapolation, which is not appropriate at the pleading stage.

Accordingly, Defendant Ott's motion to dismiss Plaintiff's claims against him as untimely will be denied, without prejudice to his right to raise the statute of limitations defense, if appropriate, after further development of the factual record through a period of limited discovery.

An appropriate Order follows.